UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| KRISTEN PLUMMER, on behalf of herself and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
|---|---|---|
| Plaintiff, | | |
| v. | | Cause No. 1:17-cv-2177-WTL-MPB |
| NICOR ENERGY SERVICES COMPANY, | | |
| Defendant. | | |

## ENTRY ON DEFENDANT'S MOTION TO COMPEL AND PLAINTIFF'S MOTIONS TO STRIKE

This matter is before the Court on Defendant Nicor Energy Services Company's ("Nicor") Motion to Compel Arbitration and to Stay Plaintiff Kristen Plummer's Class Action Complaint ("Motion to Compel") (Dkt. No. 21). Also before the Court are Plummer's Motion to Strike Paragraphs 4 and 5 and Exhibits A and B of the Declaration of Pamela Watkins ("Motion to Strike Exhibits") (Dkt. No. 33) and her Motion to Strike Reply in Support of Motion ("Motion to Strike Reply") (Dkt. No. 43). The Court, being duly advised, hereby **DENIES as moot** Plummer's Motion to Strike Exhibits, **DENIES** Plummer's Motion to Strike Reply, and **DENIES** Nicor's Motion to Compel, for the reasons set forth below.

### I. BACKGROUND

#### A. Facts Alleged in the Complaint

In her putative class action Complaint, Plummer alleges the following facts. Defendant Nicor enters into business relationships with public utilities that provide essential services to consumers, such as gas, electricity, and water. Under this arrangement, the utility: (1) provides Nicor with access to all the names and contact information of its customers; (2) allows Nicor the

use of the utility's trade names, logos, service marks, and trademarks; and (3) allows Nicor access to the utility's marketing channels. The utility also allows Nicor's charges to appear on the utility bill so that the consumer pays both the utility and Nicor under a lump sum. In exchange, Nicor pays the public utility 10-15% of the revenue it receives from the utility's customers. Plummer alleges that the repair plans offered by Nicor are of little or no value to consumers and that Nicor's business arrangements with public utilities violate Indiana statutes designed to protect Hoosiers from deceptive telephone solicitations and from companies pretending to be governmental entities.

Indiana Gas Company, Inc. ("Vectren") is a public utility regulated by the Indiana Utility Regulatory Commission ("IURC"). Nicor is not subject to the IURC's regulations.

Vectren entered into a relationship with Nicor that allows Nicor to charge Vectren customers for Nicor charges on Vectren bills. The bill is a monthly utility bill that contains Vectren's logo and colors, but Nicor's name is not on the bill. The charges are broken into two categories: (1) "Vectren Delivery and Supply Charges;" and (2) "Non Vectren Energy Delivery Charges." The latter charges are billed by Nicor.

At the end of June 2016, Plummer moved to a different rental home and called Vectren to transfer her utility service. Rather than a Vectren representative handling the call, a Nicor representative conducted the transfer of Plummer's Vectren service and then, approximately twenty-one minutes later, switched hats and began telling Plummer about Vectren Home Solutions' insurance plan (the "Plan"). The Nicor representative stated that, now that she had completed Plummer's transfer request, she would provide Plummer with important information

on home services available through Vectren Home Solutions.[1] The Nicor representative read various terms at a rapid pace, and Plummer assented to various leading questions. At one point, the Nicor representative stated that the monthly amount due would not be paid at that time but would appear on Plummer's Vectren utility bill, which Plummer agreed to. The representative then sought Plummer's consent to a phone confirmation in lieu of a written contract and stated that she would also provide Plummer with her Vectren account number. Plummer agreed. She then stated that Plummer wished to enroll in the monthly plan with Vectren Home Solutions for $22.75, "right Kristen?" Plummer responded, "Yes." Dkt. No. 24. Immediately thereafter, the Nicor representative stated that the charge would be billed to the new Vectren energy account number, which she then provided Plummer. The Nicor representative then told Plummer that additional terms and conditions applied and stated "please review" the additional terms and conditions. The Nicor representative then requested authorization to contact Plummer by phone, to which she assented.

In August 2016, Plummer started receiving Vectren bills at her new address, which she paid. In November 2016, Plummer noticed the "Non Vectren Energy Delivery Charges" on her Vectren bill. She called Vectren to ask about the charges and was told that they were Vectren Home Solutions charges for insurance that would cover any gas line repairs. Plummer "explained that she doesn't own her home, that she's renting, and wouldn't have, and didn't sign up for that plan." Dkt. No. 1-3 at 10. Plummer then called the "Vectren Home Solutions Contact" number provided to cancel the Plan.

---

[1] Neither party has provided a transcript of the phone call. The record contains an audio recording of the phone call, *see* Dkt. No. 24, which the Court has reviewed.

## B. The Plan

In conjunction with its Motion to Compel, Nicor submitted the Declaration of Pamela Watkins along with Exhibits A and B. Exhibit A is the audio recording of the telephone call between Nicor's representative and Plummer when she sought to transfer her service with Vectren. Exhibit B consists of a welcome letter ("Welcome Letter") from Vectren Home Solutions and a document entitled "Residential Customer Agreement" that outlines the terms and conditions of the Plan. The Welcome Letter states that "[t]he terms and conditions of the plan(s) you've selected are enclosed in this mailing." Dkt. No. 22-1 at 6. Section 10 of the Plan provides that Plummer may cancel the Plan for a full refund if done within thirty days from the commencement date, which is the date she sought to transfer her utility service and allegedly entered into the Plan.

Section 16.1 of the Plan states, "**In the unlikely event that [Nicor's] customer service department is unable to resolve a complaint You may have to your satisfaction …, we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.**" *Id.* at 15 (emphasis in original). Section 16.2, labeled "Arbitration Agreement" states that "[Nicor] and [Plummer] agree to arbitrate **all disputes and claims** between [them]. This agreement to arbitrate is intended to be broadly interpreted." *Id.* (emphasis in original). It further states that the agreement to arbitrate includes: (1) claims arising out of or relating to any aspect of the relationship between Nicor and Plummer, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory; (2) claims that arose before the Plan's commencement, including those related to advertising; and (3) claims that may arise after the termination of the Plan.

Finally, the Plan states that it is "a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement." *Id.*

## II. **MOTIONS TO STRIKE**

Plummer has filed both a Motion to Strike Exhibits and a Motion to Strike Reply. In conjunction with its Motion to Compel, Nicor submitted the Declaration of Pamela Watkins ("First Declaration"), who is a manager of warranty billing and product operations for Nicor. In the First Declaration, Watkins averred that Plummer called on July 5, 2016, and enrolled in the Plan with a Nicor representative. She further stated that "[t]he [Nicor] representative then confirmed that [Plummer's] verbal responses constituted her agreement to enroll in lieu of a written signature. Plaintiff agreed." Dkt. No. 22-1 at 2. Watkins stated that the Nicor representative informed Plummer that she would receive the Plan in the mail and that Nicor mailed Plummer the Welcome Letter and the Plan on July 6, 2016. Watkins submitted the audio recording of the phone call between Plummer and the Nicor representative and the Welcome Letter and attached Plan as Exhibits A and B to her Declaration.

Following Nicor's Motion to Compel, the Magistrate Judge allowed Plummer to depose Watkins. At her deposition, Watkins admitted that she never listened to the audio recording submitted as Exhibit A and had no personal knowledge that the Welcome Letter and Plan were ever sent to Plummer.

Along with its Reply in Support of Motion to Compel Arbitration and to Stay ("Reply Brief"), Nicor submitted the Supplemental Declaration of Pamela Watkins ("Supplemental Declaration") as well as the Declaration of Katie Markus ("Markus Declaration"). In her Supplemental Declaration, Watkins maintains that she has access to Nicor's business records,

including records relating to customer phone calls, customer account information, and customer correspondence. She claims that the information in the Supplemental Declaration is "based on [her] review of those business records and [her] understanding of certain [Nicor] business practices, based on [her] experience as an employee of [Nicor]." Dkt. No. 38-1 at 3. She also affirms that Exhibit A that was attached to her First Declaration is a phone call between Plummer and a Nicor representative. Watkins avers that "[i]n the ordinary course of business, [Nicor] records phone conversations between customers who call to initiate service with [Vectren] or to move their existing Vectren service to a new address. [Nicor] maintains those recordings in its telephony system in the ordinary course of business." *Id.* at 3. Watkins states that the calls are associated with a unique identifier known as a UCID number. She then states that her subordinate found Plummer's recording using the UCID number, which she located by using the name and address on the documents Plummer filed in the case.

Watkins admits that she did not listen to the audio recording, Exhibit A, prior to executing her First Declaration as it "would not have assisted [her] in determining that it was the recording of the call on which Plummer enrolled in the home warranty product because [she] did not participate in that call and [she does] not know what Plummer's voice sounds like." *Id.* at 4. Watkins avers that she was familiar with the recording's content based on a written summary provided to her by Markus on May 25, 2017. She states that Markus "regularly provides customer call summaries in the ordinary course of business to assist me in addressing customer account issues." *Id.*

Watkins also "reaffirm[s]" that Exhibit B is a true and accurate copy of the Nicor Welcome Letter and Plan that was mailed to Plummer. *Id.* She states that when a customer enrolls in a service plan with Nicor, the Nicor agent enters the customer's information, including

6

her name, address, purchases, and other data, into the Nicor system. Watkins declares that she "understand[s] that the automated [Nicor] system then generates an electronic enrollment file, which is placed on a secure [] site in the ordinary course of business." *Id.* at 5. Nicor's print vendor, HKM, then takes the enrollment file from the site to create "proofs" of the customer's welcome package, which includes the plan they enrolled in. Those proofs are then reviewed and approved by the marketing department and sent back to HKM to print and mail to customers on behalf of Nicor. This process takes approximately seven to ten days. "HKM maintains electronic copies of the enrollment files and finalized proofs in the ordinary course of business." *Id.* By "reviewing documents maintained in the ordinary course of business by [Nicor] and HKM," Watkins confirmed that HKM sent the Welcome Letter and Plan to Plummer on Nicor's behalf on July 12, 2016. Watkins' department manages the processing of returned mail and reviewed Plummer's customer account record to verify that there was no notation of a return of the package sent to Plummer.

Markus is the Warranty Operations Supervisor at Nicor. She states in her declaration that she has access to Nicor's business records, including those relating to customer phone calls, customer account information, and customer correspondence. Like Watkins, Markus explains how phone conversations were stored as business records with UCID numbers. She states that "[a]s a Warranty Operations Supervisor, [she] regularly, in the ordinary course of business, identif[ies] recorded calls based on the UCID numbers, listen[s] to the recordings, and provide[s] written summaries of the recordings to assist other [Nicor] employees in addressing customer account issues, including disputes." Dkt. No. 38-2 at 3. She also provides call summaries to Nicor employees, including her supervisor, Watkins, in the event that context is needed for

customer escalation. In her prior role as Warranty Specialist, she provided call summaries approximately 15-20 times per month.

Markus states that on May 23, 2017, Watkins instructed her to retrieve the July 5, 2016, call between Plummer and a Nicor agent. Markus identified Plummer's UCID number from her customer record and gave it to Nicor's telephony group, which matched the recording and provided the audio recording to her. Markus listened to the recording and heard Plummer state her full legal name, address, and phone number. She verified that the phone number and address matched Nicor's customer records for Plummer. While listening to the call, Markus drafted a summary of the conversation, which she provided to Watkins on May 25, 2017.

On May 24, 2017, Watkins submitted a request to the Nicor Information Technology Department to make the recording available to in-house legal counsel, which was completed the following day.

In her Motion to Strike Reply, Plummer seeks to strike the Supplemental and Markus Declarations and argues that they were improperly submitted on reply and are not based on personal knowledge to satisfy the business record exception in Federal Rule of Evidence 803(6).[2]

Under the business record exception, records of regularly conducted activity, made at or near the time of the transaction, are excluded from the hearsay rule unless "the source of information or the method of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). "Such records are presumed reliable because businesses depend upon them for the operation of their own affairs, and therefore there is little incentive to falsify such records, and

---

[2] Plummer also claims that Watkins' Supplemental Declaration "contradicts her deposition and should be stricken." Dkt. No. 43 at 6. In support, she merely recites deposition testimony relating to whether she had "personal knowledge" that the Welcome Letter was sent out. *Id.* Watkins' Supplemental Declaration, however, does not attempt to establish her personal knowledge in that regard, but rather her knowledge of Nicor's relevant business practices.

8

because the regularity of such record-keeping leads to habits of accuracy." *United States v. Petrunak*, 856 F.3d 484, 486 (7th Cir. 2017) (citation omitted). "Rule 803(6) requires authentication by a 'custodian or another qualified witness.'" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015).

Plummer has failed to cite to any relevant authority to establish that Nicor's submission of the Supplemental and Markus Declarations is improper; in fact, her authority establishes that the documents may be considered by the Court. "[N]ew arguments and evidence may not be raised for the first time in a reply brief." *Reis v. Robbins*, 4:14-cv-00063-RLY-TAB, 2015 WL 846526 at *2 (S.D. Ind. Feb. 26, 2015). "A party, however, may expand upon and clarify arguments in its reply brief." *Id*. That is precisely the case here. Nicor's submissions with its reply brief merely seek to supplement and correct any deficiencies raised by Plummer in her response brief.

Plummer's argument seeking to strike the Supplemental and Markus declarations because they are not based on personal knowledge is equally unavailing, for the declarations fall well within the business records exceptions precluding such a requirement. As noted more fully above, business records of regularly conducted activity, made at or near the time of the transaction, are excluded from the hearsay rule unless "the source of information or the method of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). Plummer does not argue that Markus or Watkins are not qualified to authenticate Exhibits A and B, much less suggest any lack of trustworthiness that would preclude the application of the business records exception. Indeed, as noted above, "[s]uch records are presumed reliable because businesses depend on them to conduct their own affairs, so there is little if any incentive to be deceitful, and because the regularity of creating such records leads to habits of accuracy." *Jordan v. Binns*, 712

9

F.3d 1123, 1135 (7th Cir. 2013). Although it is well established "that documents prepared in anticipation of litigation are not admissible under [Rule] 803(6)[,]" that is not the case here. Exhibits A and B were created contemporaneously with Plummer's phone call and stored by Nicor in the ordinary course of business. Accordingly, they fall under the business records exception and are admissible. Plummer's Motion to Strike Reply is **DENIED**. [3]

### III. MOTION TO COMPEL

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, provides that arbitration provisions in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration may only be compelled where there is a contract between the parties that requires arbitration. *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995). "Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns*, 666 F.3d 1027, 1033 (7th Cir. 2012) (citations omitted). The burden to avoid arbitration is equivalent to successfully opposing a summary judgment under Rule 56, and "the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The Court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted

---

[3] In Plummer's Motion to Strike Exhibits, she argued that Watkins' First Declaration was insufficient to authenticate Exhibits A and B. The Court agrees. However, as set forth in detail above, Watkins' Supplemental Declaration and Markus's Declaration do set forth the information necessary to demonstrate that the business records exception applies. Accordingly, the Motion to Strike Exhibits is DENIED.

dispute.'" *Kiefer v. Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 908, 909 (7th Cir. 1999) (quoting *United Steelworks v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

In determining whether to apply a contract's arbitration clause to a dispute, the Court must apply state-law contract formation principles. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002). The parties do not dispute that Indiana contract law governs the claims in this case. "The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties." *Conwell v. Gray Loon Outdoor Mktg. Group, Inc.*, 906 N.E.2d 805, 812-13 (Ind. 2009) (citation omitted). *Id*. Only the essential terms of a contract are needed to render a contract enforceable. *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. Ct. App. 2002). Nonetheless, "where any essential element is omitted from a contract, or is left obscure or undefined, so as to leave the intention of the parties uncertain as to any substantial term of the contract, the contract may not be specifically enforced." *Conwell*, 906 N.E.2d at 813 (citation omitted).

"Under Indiana contract law, the party seeking to compel arbitration has the burden of demonstrating the existence of an enforceable arbitration agreement." *Watts Water Techs., Inc. v. State Farm Fire & Ca. Co.*, 66 N.E.3d 983, 989 (Ind. Ct. App. 2016). In determining whether the parties agreed to arbitrate a dispute, the Court must apply ordinary contract principles governed by state law. *Showboat Marina Casino P'ship v. Tonn & Blan Constr.*, 790 N.E.2d 595, 597 (Ind. Ct. App. 2003) (citations omitted). In construing arbitration agreements, all doubts are to be resolved in favor of arbitration, and the parties are bound to arbitrate all matters, not reasonably excluded, which reasonably fit within the language used. *Watts*, 66 N.E.3d at 989 (citation omitted). "However, parties are only bound to arbitrate those issues that by clear language they have agreed to arbitrate." *Id*. Moreover, parties will only be bound to arbitrate

those claims when there is evidence of their intent to do so. *Id*. "The Supreme Court has made this clear – 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [s]he has not agreed to submit.'" *MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).

Nicor claims that the Court must compel arbitration because Plummer was on reasonable notice that she was entering into an arbitration agreement with Nicor. Nicor asserts that Plummer, during the phone call, stated her name, address, and that she wished to enroll in the Plan for a monthly fee of $22.75, and confirmed that the taped recording would suffice in lieu of a signed written contract. Nicor contends that this is sufficient to enforce the Plan that contained the arbitration agreement mailed to her approximately twelve days after the phone call. Moreover, Nicor contends that Plummer accepted the additional terms and conditions, including the arbitration clause, which were sent to her because she failed to cancel within the thirty-day window set forth in the Plan and accepted the benefits of the Plan.

Plummer rejects Nicor's notion that her silence or failure to cancel within thirty days constitutes acceptance of the additional terms. The Court agrees.

Indiana follows the Restatement (Second) of Contracts to determine when silence by acceptance may be inferred as between two parties. It states:

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:

  (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

  (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

> (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restatement (Second) of Contracts § 69(1). Nicor contends that Plummer's silence serves as acceptance of the new conditions, but its arguments are unavailing. Nicor first claims that Plummer received the benefit of the insurance and therefore assented to the Plan. But whether Plummer actually received the benefit of the insurance prior to canceling the Plan is immaterial as to whether she "agreed so to submit" to the arbitration clause in the Plan mailed to her. *AT & T Techs.*, 475 U.S. at 648. Although the Nicor representative may have obtained Plummer's assent to the price for the type of coverage offered by Nicor, which the representative rapidly spoke of at length, the representative never acquired her consent to the additional terms and conditions that were later mailed to her new address and no consideration was provided by Nicor for these additional terms. Restatement (Second) of Contracts § 69(1)(a). To the extent there was a contract between the parties, it was formed during the phone conversation.

Moreover, even if Plummer did read the Plan and Welcome Letter, no language exists to state that, absent her canceling the Plan within 30 days of receipt, the additional terms and conditions govern the parties' relationship; it merely states that the parties "agree" to arbitrate any claims between Plummer and Nicor – something that Plummer never in fact agreed to. Restatement (Second) of Contracts § 69(1)(b). The section titled "Cancellation" merely states that if Plummer or Nicor cancel the Plan within thirty days of its commencement "and [Plummer] [has] not made any request for service hereunder, [Plummer] will receive a full refund of the [Plan] purchase price paid." Dkt. No. 22-1 at 14.

Finally, despite Nicor's assertion to the contrary, the parties had no "prior dealings" that would have put Plummer on notice that she must reject the new terms if she did not intend to accept them. Restatement (Second) of Contracts § 69(1)(c).

Nicor cites to *Hill v. Gateway*, 105 F.3d 1147 (7th Cir. 1997), for the proposition that an arbitration clause will be enforced if it is mailed to a consumer along with the product purchased. In *Hill*, the Hills purchased a computer from Gateway, which in turn shipped the computer in a box to the Hills that also contained "a list of terms, said to govern unless the customer returns the computer within 30 days." *Id*. at 1148. After the Hills brought claims against Gateway, Gateway sought enforcement of the arbitration clause that had been included in the terms in the box. Upholding the arbitration clause, the *Hill* court noted that "[a] contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Id*. (citation omitted). It further stated that the "[t]erms inside Gateway's box stand or fall together. If they constitute the parties' contract because the Hills had an opportunity to return the computer after reading them, then all must be enforced." *Id*. The court noted that "practical considerations support allowing vendors to enclose the full legal terms with their products. . . . Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device." *Id*. at 1149.

But that it is not the case here. Nothing in the Welcome Letter or Plan indicates that the terms govern the parties' contract upon some affirmative action by Plummer. Nor is there anything that states that her failure to act within a certain number of days following receipt will serve as acceptance. If Nicor wished to have Plummer accept the new terms and conditions, it was incumbent on Nicor to obtain her consent to do so in some fashion. Nicor, however, failed in that regard and therefore its Motion to Compel is **DENIED**.

## IV. **CONCLUSION**

For the reasons set forth above, Plummer's Motion to Strike Exhibits is **DENIED.** Dkt. No. 33. Plummer's Motion to Strike Reply is also **DENIED**. Dkt. No. 43. Finally, Nicor's Motion to Compel is **DENIED**. Dkt. No. 21.

SO ORDERED: 3/5/18

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication